J-S31044-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :  IN THE SUPERIOR COURT OF
 :          PENNSYLVANIA
 :
v.     :
 :
 :
TIM JORDAN     :
 :
Appellant   :   No. 1104 EDA 2020

Appeal from the Judgment of Sentence Entered February 28, 2020
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0008183-2015

BEFORE: STABILE, J., KING, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:     **FILED NOVEMBER 29, 2021**

Tim Jordan (Jordan) appeals from the judgment of sentence imposed by the Court of Common Pleas of Philadelphia County (trial court) after his jury conviction for second-degree murder,[1] four counts of robbery[2] and related crimes.[3] He challenges (1) the weight of the evidence, (2) the denial of a Rule 600 motion, (3) the overruling of evidence of a prior assault, and (4) the prosecutor's misconduct. We affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(b).

[2] 18 Pa.C.S. § 3701(a)(1)(l).

[3] The related crimes included possessing an instrument of crime, criminal conspiracy, firearms not to be carried without a license and carrying firearms in public in Philadelphia. 18 Pa.C.S. §§ 907(a), 903, 6106(a)(1), 6108.

We take the following factual background and procedural history from the trial court's December 15, 2020 opinion and our independent review of the record.

## I.

The charges in this matter relate to the June 10, 2014 robberies at a drug house of four individuals[4] by Tim Jordan (aka T1), Kharee Muhammad (aka Kaz), Andrew Baker, Joshua Voght and Brandon Munroe (aka B-Dub) at a drug house around the corner from Voght's house. The incident resulted in the fatal shooting of Moises Mora, one of the robbery victims, who was purportedly killed by Jordan as he attempted to flee. On October 22, 2014, police arrested Jordan and charged him with the foregoing crimes.[5] Following a preliminary hearing on August 12, 2015, he was bound over for trial and an Information was filed on August 18, 2015.

## A.

On September 8, 2017, Jordan filed a motion to dismiss based on Rule 600. The trial court explains:

---

[4] The victims included Humberto Sarmiento, Jose Miguel Colon-Torres, Ruben Dario Pasquel-Lopez and Decedent Moises Mora. (**See** Information, 10/18/15).

[5] Jordan also was charged with burglary, 18 Pa.C.S. § 3502(a)(1), of which he was later acquitted. The Commonwealth *nolle prossed* charges of theft by unlawful taking, 18 Pa.C.S. § 3921(a), and receiving stolen property, 18 Pa.C.S. § 3925(a), and the conspiracy charges related to them.

On September 11, 2017, the court held a hearing on Mr. Jordan's motion to dismiss pursuant to Rule 600. The Assistant District Attorney took the stand testifying that on January 20th 2015, the preliminary hearing was continued as one of the defense counsel was unavailable. (*See* N.T. Hearing, 9/11/17, at 11-12).

Furthermore, she testified that the preliminary hearing of March 17, 2015 was continued because a line-up had been previously ordered and [Jordan] had not been brought down. The prosecutor further testified that they had checked which prison [Jordan] was assigned and then had a writ prepared to bring [him] from S.C.I. Graterford where he was housed, to CFCF prison for the line-up. Pursuant to that paperwork, [Jordan] was transported to CFCF on March 3rd, but incorrectly returned to his home prison on March 4th, before the line-up. (*See id.* at 9-11).

Moreover, the prosecutor explained that prior to the next line-up date in April, she called the prison to make sure [Jordan] would not only be brought down from state custody but would remain in the county prison until after the line-up. The prison confirmed that all would be well, then did the exact same thing as before, sent Mr. Jordan back to state custody prior to the line-up being conducted. (*See id.* at 11-14).

The prosecutor identified three dates: June 17th, 2015; June 24, 2015 and January 30, 2017 that she requested that the cases not be severed. Two co-defendants had agreed to plead guilty and cooperate. The case against the other three was the exact same-one decedent and four other complainants and keeping the cases together was most efficient and in the best interest of all involved.

The majority of continuance requests were made at the request of, or for the benefit of [Jordan], who up to and including February 6, 2019, was still requesting continuances for further investigation. Several of the continuances were because the prosecution did not want to sever when one or more of the co-defendants was given a continuance. …

(Trial Court Opinion, 12/15/20, at 6-7). The court denied Jordan's motion to dismiss and he did not file any others.

**B.**

**1.**

Jury selection began on November 14, 2019. The Commonwealth presented the trial testimony of approximately 20 people, including co-conspirators Joshua Voght and Andrew Baker;[6] Philadelphia Police Officers Christopher Daukaus, Christopher Hyk and Derrick Suragh; and Philadelphia Police Detective and expert witness James Dunlap and Homicide Detective Thorsten Lucke; Deputy Medical Examiner Dr. Albert Chu; Forensic scientist Tatimot Adekanmbi; robbery victim Humberto Sarmiento; eyewitness Jorge Blanco; and witnesses Jennifer Wong and Philip Dawson.

> Joshua Voght testified for two days.[7] This co-conspirator told the jury that in June of 2014, he was living [on] Wingoshocking Street in Philadelphia with his girlfriend, Jennifer Wong, her three sons and another girl. (**See** N.T. Trial, 11/21/19, at 7-8). In the early afternoon of June 10th, he drove with his girlfriend Wong, in his dark blue Hyundai Sonata, to 17th and Dauphin Street to meet up with his friend Andrew [Baker]. (**See id.** at 9-14). They had been hanging out for a while when Andrew asked if he and a friend could borrow Joshua's car. (**See id.** at 16). Voght ignored the request and later Andrew [and Muhammad] asked if [Voght] could give some people a ride. Prior to getting in the car, they explained to Voght that they were going

_____

[6] In exchange for their guilty pleas to lesser charges, Voght and Baker testified on behalf of the Commonwealth. (**See** N.T. Trial, 11/21/19, at 114-18; N.T. Trial, 12/04/19, at 117-21). On April 6, 2019, Munroe pleaded guilty to third-degree murder, four counts of robbery and related crimes in exchange for a total aggregate sentence of not less than 15 nor more than 30 years' incarceration. (**See** Commonwealth's Brief, at 19-20 n.5).

[7] He testified on direct on November 21, 2019, and on cross-examination and re-direct after returning from the Thanksgiving break on December 3, 2019.

to rob somebody and that they would split some of the money with him. When they were proposing the robbery, Voght was sitting in the driver's seat, Andrew in the front passenger seat and Muhammad in the back seat behind the driver. This witness testified he had known Muhammad before, hanging out with him and talking about robbing a neighborhood drug house on previous occasions. (*See id.* at 16-28). They pulled around the corner on to Susquehanna Avenue where two other young men [(Jordan and Brandon Munroe)] got into the car. (*See id.* at 29-30). Voght had never seen these two individuals before, but eventually identified all of the individuals involved. (*See id.* at 29, 77-79; N.T. Trial, 12/03/19, at 10-12). The five decided to rob a barbershop in the area of 63rd and Haverford Avenue in West Philadelphia. They drove past the barbershop and around the block a couple of times. The guys in the back of the car were against going through with that robbery, because there was a man outside of the shop talking on his phone and it looked suspicious to them. (*See* N.T. Trial, 11/21/19, at 30-31, 82-86). Muhammad suggested that they rob the drug house around the corner from Joshua's house. (*See id.* at 32, 85, 159). They drove back to the area of Caskey Street, near where [Voght] lived. Having decided to rob the drug dealers on that street, Voght told the guys in the car that he could not drive down that road because people knew him as well as his car, so he let the three guys in the back seat out on Blavis Street, then he parked on that street's intersection with 5th Street [by a Metro PCS store]. (*See id.* at 35-40, 44). Shortly after, the three guys ran back to the car and told Voght to pull off relating that they had shot one of the robbery victims as he tried to run away. (*See id.* at 89). [The three men stole marijuana and a little bit of money from the victims. (*See id.* at 56, 59, 64).] They drove back to 17th and Dauphin where the others got out of Voght's car and went their separate ways. (*See id.* at 47-50, 85-92). He and his girlfriend went home. The witness confirmed that the police later arrived at his house and took him down to homicide for a statement. (*See id.* at 53-67). Eventually, Voght agreed to plead guilty to criminal conspiracy, four counts of robbery and eight counts of theft and additionally agreed to testify against the remaining defendants. (*See id.* at 114-18, 187).

(Trial Court Opinion, 12/15/20, at 13-14) (record citation formatting and some record citation page numbering provided).

On cross-examination, Jordan's counsel introduced a June 20, 2014 letter Voght had written while he was being held in prison after the criminal incident. The letter identified Jordan, Muhammad and Munroe by nicknames that he admitted he learned from Baker, and the letter attempted to exonerate Baker in the criminal episode. Counsel examined Voght about his statement in the letter that he would have come forward with the information sooner, but he was concerned about safety, to which counsel questioned this explanation, querying, "[y]ou never told any of this to the detectives when they interviewed you before you were arrested, right?" (N.T. Trial, 12/03/19, at 12); (*see id.* at 9-12).

On redirect, the prosecutor asked Voght about the June 20, 2014 letter that had been brought up by defense counsel. In response to defense counsel's insinuation that Voght did not have safety concerns, the prosecutor asked Voght if he continued to have them and if anything had happened to him while in prison to contribute to those fears. Voght responded that he had been assaulted in a holding cell. The prosecutor asked if discovery in this matter had already been provided to the defense at that time. Jordan's counsel objected, arguing "[t]here's been nothing on this record that that attack had anything to do with his cooperation." (*Id.* at 49-53); (*see also id.* at 41-44, 82). The court overruled the objection.

> Another co-defendant, Andrew Baker, took the stand identifying Jordan and Muhammad standing trial, recounting everyone's participation in the events and corroborating Voght's testimony. Baker told the jury that on the 10th of June he was

- 6 -

around Chadwick and Dauphin Streets when [Voght] pulled up with Jen [Wong], his girlfriend. This witness verified Voght's testimony that Kaz [(Muhammad)] suggested robbing the drug house around the corner from Voght's house, which was rejected at the time, and the men then settled on robbing a barbershop in West Philadelphia. Baker recounted how he, Voght, and Kaz [(Muhammad)] got in the car and drove away, picking up B-Dub [(Brandon Munroe)] and T1 [(Jordan)], and driving out to the barbershop. Again, this witness validated the co-defendant's previous testimony that the men canceled their plans to rob the barbershop because 'it didn't look right.' (**See** N.T. Trial 12/04/19, at 70-81, 194). Baker confirmed that they all drove back to North Philly where [Voght] identified the house where the drugs were sold, , as well as that [Kharee Muhammad], [Jordan] and [Brandon Munroe] jumped out of the car after telling Josh [Voght] and Andrew [Baker] to park. The three assailants ran back towards the drug house, and when they returned, [Jordan] said, "Pull off. I shot him." (**Id.** at 85)[; (**see id.** at 81-84). [Baker identified Muhammad, Jordan and Munroe running away from the murder scene in surveillance footage from a local Metro PCS store. (**See id.** at 124).]

(Trial Court Opinion, at 15) (record citation formatting and some record citation page numbering provided).

Ms. Wong testified that at the time of the incident, she was living at the Wingoshocking address with Voght and her children. On that day, she had gone for a ride with Voght when he went to see Andrew Baker on Dauphin Street. The males spoke for a while, then drove off, leaving Ms. Wong on Dauphin Street for approximately one hour with Harding Kelly, whom she knew as "Hayes." Voght appeared nervous when he returned with Andrew Baker and two other men. She and Voght returned home. A little while later, the police appeared there and separately took Ms. Wong and Voght to police headquarters for statements. At the police station, Ms. Wong identified

photographs of some of the individuals she had seen that day on the corner and upon getting in the car. Philadelphia Police Detective Philip Nordo[8] showed Ms. Wong a photo array at her home on June 13, 2014, and despite his encouragement, she was unable to identify anyone. Detective Nordo returned to Voght and Ms. Wong's home on August 14, 2014, at which time she identified Muhammad as the black male with dreadlocks or braids, stating he was familiar because she had seen him on her porch before with Voght. At trial, she identified Jordan as one of the five individuals who had been in the Hyundai on June 10, 2014. (*See* N.T. Trial, 11/20/19, at 10-53, 40, 101, 132, 155-59).

Robbery victim Humberto Sarmiento testified that three armed black males approached him, Pasqual-Lopez and Colon-Torres[9] outside 433 Caskey Street demanding money. Mora, who was standing at the doorway, ran into the house when he saw the three defendants approaching. One of the three assailants, who was armed with a revolver, ran into the house after Mora. The other two attackers remained outside demanding money, one with what Sarmiento believed was a .9 millimeter and one with a .45 caliber. One of the assailants who remained with him outside had braids. When he attempted to

---

[8] Detective Nordo did not testify at trial.

[9] Pasqual-Lopez did not respond to subpoenas left at his mother's residence and Colon-Torres refused service and advised he would not appear in court. (*See* N.T. Trial, 12/09/19, at 15-16).

give them his cell phone, they pushed it away, but he saw Pasqual-Lopez and Colon-Torres handing them their wallets and cell phones. Sarmiento heard a gunshot from inside the house and the two attackers who remained outside told him to shut up and not say anything. As the three assailants ran toward 5th Street, Sarmiento and his two friends tried to chase them, but they got into a vehicle and got away. (*See* N.T. Trial, 11/19/19, at 51-56).

**2.**

Several bystanders who observed the incident testified. Joseph Blanco testified that he lived near the scene of the shooting. He looked outside when he heard the gunshot and saw Sarmiento, Colon-Torres and a male with a gun on the steps of 433 Caskey Street. He did not see Pasquel-Lopez. He described the armed assailant he saw standing with his neighbors as approximately 6'1" and skinny, wearing a gray hooded sweatshirt and black pants, with a silver .44 caliber firearm without an extended clip. Mr. Blanco stated he then saw two black men come running out of the house and Sarmiento and Colon-Torres chase them. He did not identify Jordan in a lineup. (*See id.* at 95-101, 108-09, 122-23, 126, 129-30, 166-68).

Witness Philip Dawson testified that on June 10, 2014, he was working in the area of the shooting in the late afternoon when he heard a commotion and saw a group of young men running from Caskey Street to North 5th Street and onto Blavis Street. Thirty second later, he observed the men in a black Hyundai pull off Blavis Street and onto 5th Street before speeding away. He

wrote down the license plate of the vehicle because the incident seemed suspicious. (*See* N.T. Trial, 11/18/19, at 78-82).

**3.**

A number of police witnesses who either responded to the incident or did forensic analysis also testified. Expert witness Detective Dunlap testified that he was cellular analysis survey certified and had been accepted as an expert in the field of historical cell phone analysis several times. (*See* N.T. Trial, 12/06/19, at 116-21). He testified that the data shows the general area where a particular phone is at a certain time and, in this case, merely includes or excludes an individual from being in the area of the crime scene. (*See id.* at 133). He also testified that video surveillance of the area from a Metro PCS store showed the black Hyundai pulling up on Blavis Street and crossing 5th Street. A short time later, three individuals ran past the store and then the black Hyundai exited Blavis Street onto 5th Street. (*See id.* at 119-23).

Officer Hyk was working as a plainclothes officer on June 10, 2014, and spoke with Mr. Dawson that evening. Mr. Dawson provided him with the tag number of the Hyundai he had seen leaving the area earlier. Later that evening, Officer Hyk and his partner found the Hyundai near to where the shooting had taken place and on the same street as the vehicle's registered Wingoshocking address. Homicide detectives met Officer Hyk and went to the residence while Officer Hyk remained outside by the vehicle. Voght came

outside and gave the police the keys to the Hyundai, which was towed to the police garage. (*See* N.T. Trial, 11/18/19, at 130-36, 141-44).

Officer Daukaus testified that he and his partner were the first to respond to the radio bulletin of a male shot on the highway on the 400 block of West Caskey Street in North Philadelphia. When they arrived at the scene, they observed the wounded Mora in the back of a pickup truck. The officers took him to Temple Hospital. (*See id.* at 48-49). Dr. Chu testified that the bullet had struck Mora in the left side of the central or lower back, ultimately traveling to the left lung and heart. He opined that to a reasonable degree of medical certainty, the cause of death was the gunshot wound and the manner of death was homicide. (*See id.* at 73-76).

Officer Suragh testified that he worked that day, responded to the radio call and secured the 433 West Caskey Street location where he observed shell casings and blood. (*See* N.T. Trial, 12/03/19, at 83-89). The officer spoke with four witnesses who gave him a description of the assailants and he transported two of them to the homicide division where they and the officer gave statements. (*See id.* at 89-107). Forensic scientist Adekanmbi testified that testing of DNA samples taken from the car was inconclusive because they were not large enough. (*See* N.T. Trial, 12/04/19, at 36-39).

Homicide Detective Lucke testified in relevant part about Commonwealth's Exhibit 127, a "phone dump" (*i.e.,* a report reflecting the information he extracted from a cellular phone used by Munroe). He identified

Commonwealth Exhibit 157C as a screenshot of an April 29, 2014 Instagram post that contained a photograph of three men in a car from Munroe's Instagram account, "blvck_lyfe." Baker identified Jordan as being one of the individuals in the photograph and defense counsel referred to the photograph as "the one with them driving in the car on 4/29." Baker identified the Instagram account, "pitch_blak_lyfe" as also being Munroe's. The exhibit was moved into evidence. (*See* N.T. Trial, 12/11/19, at 20-21, 42-44, 69-71, 102-04); (*see also* N.T. Trial, 12/04/19, at 104-05; N.T. Trial, 12/05/19, at 24) ("Q. All right. Does the picture that you point out that you say is T1 [(Jordan)], that's … from B-Dub, Brandon Munroe's [Instagram account], correct? A. Right.").

## C.

At the close of the evidence, the trial court offered the following instruction:

> Ladies and Gentlemen, you have heard all of the evidence that's going to be presented in this case. The next step in our trial is for counsel to make their closing arguments to you. Now, even though these arguments are not evidence, they are very important, so I'm going to ask you to pay careful attention.
>
> When counsel makes closing argument, what they typically do is review the evidence with you and ask you to draw certain inferences from that evidence. That can be very helpful in evaluating a case. I do need you to keep in mind, however, that you're not bound by counsels' reflection of the evidence nor are you bound by counsels' perspective of what the evidence in the case shows. It is your recollection of the evidence and your recollection alone which must guide your deliberations in this case.

In addition, you are not limited in your consideration of the evidence to the particular evidence counsel decides to review with you. You may and you should consider any of the evidence that came in during the trial that you believe to be material to the issues that you have to resolve.

(N.T. Trial, 12/12/19, at 13-14).

During closing statements, the Commonwealth prosecutor displayed Instagram photographs of the various co-conspirators together on a screen. One of the photographs had a comment, "@Pitch_Blak_Life_TI," written under it. Jordan's counsel immediately objected when the prosecutor displayed the photo during the closing, maintaining that the photograph had not been introduced at trial. The prosecutor moved on, immediately removing the photo from the screen and continuing to the next slide. The trial court denied Jordan's motion for a mistrial.

After counsel completed their closing, the court instructed the jury during its final charge:

Now, the speeches of counsel, as I told you, are not part of the evidence you should not consider them so. However, in deciding the case, you should carefully consider the evidence in light of the various reasons and arguments that each lawyer presented. It is the right and duty of each lawyer to discuss the evidence in a manner that is most favorable to the side they represent. You should be guided by each lawyer's argument to the extent they are supported by the evidence and insofar as they aid you in applying your reason and common sense. However, you are not required to accept the arguments of any lawyer. It is for you and you alone to decide the case based on the evidence as it was presented from the witness stand and in accordance with the instructions I'm now giving you. …

> Remember that it is your responsibility as jurors to perform your duties and reach a verdict based on the evidence as it was presented during the trial.

(***Id.*** at 152-54).

On December 13, 2019, the jury convicted Jordan of second-degree murder, four counts of robbery and related crimes. On February 28, 2020, the court held a sentencing hearing at which Jordan moved for extraordinary relief based on prosecutorial misconduct for showing the jury the photograph. For the first time, Jordan's counsel argued that the parties had agreed that the photograph was inadmissible unless it was redacted to not show the posted comments underneath it. In response, the prosecutor stated:

> This photograph had already been presented to the jury that day during testimony without objection.
>
> \* \* \*
>
> I did not agree with [Jordan's counsel] that the contents of this Instagram post was inadmissible and had to be redacted. That was something she could have brought up with the [c]ourt, and ask that it be ruled upon because it had already been put into evidence the day before without any redactions and without any objection. So the fact that after she reread it and did not like the contents of what was underneath in terms of what was written there, there was no objection to any of the other Instagram posts and anything else that was written in the underneath part.

(N.T. Sentencing, 2/28/20, at 14-15). The trial court denied the motion.

The trial court then imposed a mandatory term of life without parole on the murder charge. It also sentenced Jordan to not less than five nor more than ten years' imprisonment for each of the four robbery counts to run consecutively to each other, but concurrently to his life imprisonment

sentence, and a concurrent term of imprisonment of not less than five nor more than ten years for criminal conspiracy. Jordan filed a timely post-sentence motion challenging the sufficiency and weight of the evidence, which the court denied on March 9, 2021. (*See* Post-Sentence Motion, 3/09/20, at 3-4) (pagination provided). Jordan timely appealed. He and the court have complied with Rule 1925. *See* Pa.R.A.P. 1925.

## II.

### A.

Jordan first maintains that the trial court abused its discretion when it denied his Rule 600 motion to dismiss.[10] (*See* Jordan's Brief, at 30-42). He maintains that dismissal was mandated by the Commonwealth's failure to exercise due diligence to bring him to trial within 365 days after the complaint was filed. (*See id.*).

Rule 600 of the Pennsylvania Rules of Criminal Procedure provides in relevant part that "[t]rial in a court case in which a written complaint is filed against the defendant shall commence within 365 days from the date on which the complaint is filed." Pa.R.Crim.P. 600(A)(2)(a). This is the mechanical run

---

[10] Our standard of review of this issue is whether the trial court abused its discretion. *See Commonwealth v. Talley*, 236 A.3d 42, 51 (Pa. Super. 2020), *appeal denied*, 250 A.3d 468 (Pa. 2021). "Our scope of review is limited to the findings of the trial court and the evidence of record generated at the Rule 600 evidentiary hearing, which we view in the light most favorable to the prevailing party." *Id.* (citation omitted).

date. "When computing the time that has elapsed, 'periods of delay caused by the defendant,' also known as excludable time, are excluded from the length of time that has elapsed from when the complaint was filed." ***Commonwealth v. Risoldi***, 238 A.3d 434, 449 (Pa. Super. 2020), *appeal denied*, 244 A.3d 1230 (Pa. 2021) (citing Pa.R.Crim.P. 600(C)(2)).

"Excusable time, or periods of Commonwealth delay during which the Commonwealth exercised due diligence, is also added to the mechanical run date to calculate the adjusted run date." ***Id.*** (citations omitted); ***see*** Pa.R.Crim.P. 600(C)(1). "Due diligence is a fact-specific concept that must be determined on a case-by-case basis. Due diligence does not require perfect vigilance and punctilious care, but rather a showing by the Commonwealth that a reasonable effort has been put forth." ***Id.*** (citation omitted).

In reviewing a Rule 600 claim, the court must first calculate the mechanical run date and then add all excusable and excludable time to determine the adjusted run date. ***See id.*** "If a defendant does not enter a plea or begin trial by the adjusted run date, he may file a written motion seeking dismissal of all charges with prejudice. ***See*** Pa.R.Crim.P. 600(D)(1)." ***Id.***

> Additionally, when considering the trial court's ruling, this Court is not permitted to ignore the dual purpose behind Rule 600. Rule 600 serves two equally important functions: (1) the protection of the accused's speedy trial rights, and (2) the protection of society. … [T]he administrative mandate of Rule 600 was not designed to insulate the criminally accused from good faith prosecution delayed through no fault of the Commonwealth.

- 16 -

So long as there has been no misconduct on the part of the Commonwealth in an effort to evade the fundamental speedy trial rights of an accused, Rule 600 must be construed in a manner consistent with society's right to punish and deter crime. …

*Commonwealth v. Moore*, 214 A.3d 244, 248 (Pa. Super. 2019), *appeal denied*, 224 A.3d 360 (Pa. 2020) (citation omitted). "Time attributable to the normal progression of a case [] is not 'delay' for purposes of Rule 600," and is chargeable to the Commonwealth. *Commonwealth v. Mills*, 162 A.3d 323, 325 (Pa. 2017).

In this case, the trial court explained its Rule 600 decision as follows:

Clearly, the Commonwealth has met its due diligence burden. The matter commenced as a five-defendant case. The majority of continuance requests were made at the request of, or for the benefit of [Jordan], who up to and including February 6, 2019, was still requesting continuances for further investigation. Several of the continuances were because the prosecution did not want to sever when one or more of the co-defendants were given a continuance. Pennsylvania law is clear that the prosecution is not required to sever a defendant's case from that of his co-defendants in order to avoid a Rule 600 violation and the failure to sever is not evidence of lack of due diligence. *Commonwealth v. Kearse*, 890 A.2d 388 (Pa. Super. 2005); *Commonwealth v. Robbins*, 900 A.2d 413 (Pa. Super. 2006); *Commonwealth v. Jackson*, 765 A.2d 389, 395 (Pa. Super. 2000). Although the periods of delay caused by a co-defendant is not excludable, our Supreme Court has held that the time associated with the co-defendant would be excused if the prosecution acted with due diligence. *Commonwealth v. Hill*, … 736 A.2d 578, 591 ([Pa.] 1999). In the instant case, few, if any delays were attributable to the prosecution's inaction. The Commonwealth timely notified all of its intent to consolidate the cases and their decision to pursue

one consolidated trial against all the defendants was neither neglectful nor evidence of a lack of due diligence ….[11]

(Trial Court Opinion, at 7). We discern no abuse of discretion.

Jordan's criminal complaint was filed on October 8, 2014. However, it is undisputed that the triggering event for Rule 600 purposes was the date of his arrest, October 22, 2015. (**See** Jordan's Brief, at 32); (Commonwealth's Brief, at 24). With that as our starting date, we turn to our determination of Jordan's claim.

**B.**

On November 12, 2014, the Commonwealth sought a continuance of the preliminary hearing because of a witness's failure to appear due to an out-of-town work commitment and co-defendant's counsel wanting to preserve a lineup. (**See** N.T. Hearing, 9/11/17, at 17-19). The preliminary hearing was continued to January 20, 2015. This was 90 days from the date of the arrest, attributable to the Commonwealth and, thus, includable for Rule 600 purposes.[12]

---

[11] The prosecutor explained that she chose not to allow the cases to be severed because they involved three defendants (Muhammad, Munroe, Jordan) under the same facts and with the same charges. Two other co-defendants (Voght and Baker) were waiting to testify and be sentenced themselves pursuant to their plea agreements. She believed keeping the defendants together would be the most efficient means of proceeding and would best serve "the interest of justice for all parties." (N.T. Hearing, 9/11/17, at 16); (**see id.** at 15).

[12] This included 21 days from the date of arrest, plus 69 days for Commonwealth continuances.

Subsequently, the preliminary hearing was continued four times between January 20, 2015, until it was held on August 4, 2015, due to delays caused by the necessity to reschedule the lineup requested, at least in part, by Jordan's co-defendants, the unavailability of co-defendant's counsel and the Commonwealth's decision not to sever the co-defendant's cases.[13] This 196 days was excludable from the Rule 600 run-date since it was not due to the Commonwealth's failure to exercise due diligence. *See Hill*, *supra* at 591; *Kearse*, *supra* at 394 ("Commonwealth is not required to sever a defendant's case from a co-defendant's when faced with a possible Rule 600 violation.").

Formal arraignment was held on September 2, 2015, and the first pretrial conference was scheduled for September 22, 2015. The 49 days between the August 4, 2015 preliminary hearing until the first pretrial

---

[13] The January 20, 2015 preliminary hearing was continued until March 17, 2015, because of a mutual request by the Commonwealth and a co-defendant for a lineup. (56 excludable days). The scheduled March 4, 2015 lineup did not occur because, despite the Commonwealth's issuance of a writ for Jordan's appearance, he was returned to state incarceration by the Department of Corrections before it was completed, and it was not rescheduled until April 22, 2015, due to the unavailability of co-defendant's counsel. The next date all were available for the lineup was May 13, 2015. (57 excludable days) (*See* N.T. Hearing, at 10-11, 23-24, 27-29). The May 13, 2015 preliminary hearing was continued until June 17, 2015, because the Department of Corrections again failed to have Jordan available for the lineup despite the Commonwealth's proper preparation of a writ. (35 excludable days) On June 17 and 25, the Commonwealth was prepared to proceed to trial, but the preliminary hearing was continued until August 4, 2015 (48 excludable days) due to "the unavailability of counsel for co-defendant." (Jordan's Brief, at 36).

conference on September 22, 2015, were part of the "normal progression of the case" and were, therefore, attributable to the Commonwealth for Rule 600 purposes. *See Mills*, *supra* at 325. Therefore, as of September 22, 2015, there were 139 includable days for Rule 600 purposes.

The September 22, 2015 pretrial conference was continued four times at the request of the defense and was ultimately held on April 14, 2016 (204 days). The court ruled most of this time excludable, with only the time between November 17, 2015, until January 13, 2016 (57 days), being ruled includable for Rule 600 purposes. As of April 14, 2016, the excludable total was 343 days and the includable total was 196 days.

On April 14, 2016, the case was assigned to a new judge, who scheduled the trial readiness conference for April 22, 2016, and trial for January 30, 2017. The court ruled the 281-day delay between April 14, 2016, and January 30, 2017, as excludable. This was within its discretion.[14] *See Mills*, 162 A.2d at 325. Therefore, as of January 30, 2017, over 800 total days had passed

---

[14] Jordan maintains that the case was listed for trial on four dates in 2016, but was continued due to outstanding discovery, which should have been includable in the speedy trial calculation. (*See* Jordan's Brief, at 37-38). However, the docket reflects that on those dates, it was noted that discovery would be addressed via email with the ADA and that trial would remain as scheduled, January 30, 2017. (*See* Trial Court Docket, at Nos. 178-83). This final discovery was provided on January 4, 2017, and included "complex analysis of cellphone-related data and not the type of delayed production of police reports that this Court has found evidenced a lack of due diligence." (Commonwealth's Brief, at 36) (citing N.T. Hearing, 9/11/17, at 33-34, 37). We agree.

since Jordan's arrest, but only 196 of them were includable for Rule 600 speedy trial purposes.

At the January 30, 2017 trial listing, the court granted an advance defense motion for a continuance due to co-defendant Muhammad finding new counsel. It listed the new trial date as October 23, 2017. This 276 days was excludable, as the continuance was not due to the Commonwealth's lack of due diligence. **See Hill**, **supra** at 591; **Kearse**, **supra** at 394. Hence, as of October 23, 2017, the total number of days since Jordan's arrest was 1096, with 900 excludable days and 196 includable days for Rule 600 purposes.[15]

Based on the foregoing, the trial court did not abuse its discretion in finding that the Commonwealth did not violate Jordan's Rule 600 speedy trial rights as of October 23, 2017. **See Talley**, **supra** at 51. Moreover, as we note in footnote 15, our independent review of the record confirms that any Rule 600 motion filed thereafter would have lacked merit.

---

[15] As noted by Jordan and the Commonwealth, Jordan litigated his Rule 600 motion prior to the October 23, 2017 trial date and did not reassert a Rule 600 claim thereafter. (**See** Jordan's Brief, at 30 n.19); (Commonwealth's Brief, at 35-36 n.8). Therefore, the trial court's order necessarily did not pertain to any time after October 23, 2017. However, our independent review confirms the Commonwealth's representation that, in any event, the time between October 23, 2017, and the commencement of trial on November 14, 2019, was not includable for Rule 600 purposes: (1) October 23, 2017 joint request for continuance; (2) June 18, 2018 advance defense request for continuance; (3) February 4, 2019 defense counsel unavailability and joint request for continuance for negotiations; (4) February 6, 2019 defense request for further investigation.

## C.

In his second claim, Jordan argues that the trial court abused its discretion when it denied his motion for a new trial on the basis that the verdict was against the weight of the evidence.[16] (**See** Jordan's Brief, at 42-46). He argues that neither Voght nor Baker witnessed the crime and that Baker was a polluted source who received a plea deal, and there is a lack of physical evidence identifying him as the shooter. (**See id.** at 44-46).[17]

---

[16] Our standard of review for a challenge to the weight of the evidence is as follows:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the [trial] court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

**Commonwealth v. Horne**, 89 A.3d 277, 285 (Pa. Super. 2014) (citation omitted).

[17] Although Jordan complains of what the record allegedly shows and recites his version of the evidence, he provides no references to where the matters referred to appear in violation of Rule 2119(c). (**See** Jordan's Brief, at 44-46); Pa.R.A.P. 2119(c) ("If reference is made to … evidence … the argument must set forth, in immediate connection therewith, or in a footnote thereto, a reference to the place in the record where the matter referred to appears) (**see** Pa.R.A.P. 2132).").

In denying Jordan's motion, the court found that the verdict was not so contrary to the evidence as to shock one's sense of justice, nor was it so tenuous, vague and uncertain that it shock[ed] the conscience of the court." (Trial Court Opinion, at 15). Instead, it found the evidence "was compelling and substantial" and demonstrated that the co-defendants "were acting together towards one goal, the robbery of the drug house on Chadwick Street." (*Id.* at 16). It found Voght and Baker's testimony to be "credible and persuasive and corroborated by the testimony of other numerous witnesses and the physical evidence." (*Id.*). We discern no abuse of discretion.

Voght and Baker testified that they discussed committing a robbery with Muhammad, who asked the men to pick up two other individuals for the crime. Voght left his girlfriend, Ms. Wong, on Dauphin Street with Harding Kelly for about 45 minutes to an hour after the two men drove off. (*See* N.T. Trial, 11/29/19, at 14-15). Voght, Baker and Muhammad picked up Jordan and Munroe. (*See* N.T. Trial, 11/21/19, at 29-30, 77-79); (N.T. Trial, 12/03/19, at 10-12). After the five abandoned plans to rob a barbershop, they drove to the area of Caskey Street and let Jordan, Muhammad and Munroe out of the car so the three could go around the corner to rob the drug house. (*See* N.T. Trial, 11/21/19, at 35-40, 44). Robbery victim Sarmiento testified that a robber with braids stayed with him on the steps to 433 Caskey Street while another shooter chased Mora into the home and shot him. (*See* N.T. Trial,

11/19/19, at 56). Shortly after, the three guys ran back to the car and Jordan told Voght to pull off because he had shot one of the robbery victims in the lower back as he tried to run away. (*See id.* at 81-85, 89); (N.T. Trial 12/04/19, at 70-81, 194). Baker identified Jordan, Muhammad and Munroe running away from the murder scene in surveillance footage from a local Metro PCS store. (*See id.* at 124). The jury was made aware that both Voght and Baker were testifying as part of their plea agreements with the Commonwealth. (**See** N.T. Trial, 11/21/19, at 113-18); (N.T. Trial, 12/04/19, at 109-121). DNA evidence obtained from the scene was inconclusive. (*See* N.T. Trial, 12/04/19, at 38-39).

We reiterate that in deciding a weight of the evidence claim, it is not our role to re-weigh the evidence as Jordan would have us do, but to determine if the court abused its discretion in denying his motion for a new trial based on his weight claim. *See Horne*, *supra* at 285. The jury was aware that Voght and Baker's involvement in the criminal enterprise did not include witnessing the actual robbery and murder and that they got plea deals. Similarly, the DNA evidence was inconclusive, which does not exonerate Jordan from the crimes. Jordan also complains that he was not carrying a gun in the surveillance video, but there are myriad explanations for this, including, as the Commonwealth suggests, the possibility that he hid his gun in his waistband under his clothing during the flight. Finally, his other weight of the evidence arguments misstate the evidence. Contrary to his assertion, the

shooter did not have braids; Sarmiento testified that one of the robbers did, but not the shooter. Furthermore, while Jordan contends that "the evidence tended to establish" that Harding Kelly was the fifth shooter, not him, Ms. Wong testified that Kelly remained with her while the other men went to commit the robbery.

"It was within the province of the jury as fact-finder to resolve all issues of credibility, resolve conflicts in evidence, make reasonable inferences from the evidence, believe all, none, or some of the evidence, and ultimately adjudge appellant guilty." (citation omitted). *See Commonwealth v. Charlton*, 902 A.2d 554, 562 (Pa. Super. 2006), *appeal denied*, 911 A.2d 933 (Pa. 2006). That is what the jurors did here, and we discern no abuse of discretion by the trial court in denying Jordan's motion for a new trial on the basis of his weight of the evidence challenge. *See Horne*, *supra* at 285. Jordan's second claim lacks merit.

### D.

Jordan next claims that the trial court "committed an abuse of discretion by overruling objections to testimony regarding beatings and assaults suffered by Joshua Voght."[18] (Jordan's Brief, at 46). He argues that evidence that

---

[18] "Our standard of review for a trial court's evidentiary rulings is narrow, as the admissibility of evidence is within the discretion of the trial court and will be reversed only if the trial court has abused its discretion." *Commonwealth v. Hernandez*, 230 A.3d 480, 489 (Pa. Super. 2020) (citation omitted). "An abuse of discretion is not merely an error of judgment, but is rather the
*(Footnote Continued Next Page)*

witnesses were scared to testify because of the assault was irrelevant since there was no evidence linking him to it and they did, in fact, testify. He also claims that permitting this testimony was prejudicial because it allowed the jury to infer that he attempted to coerce a witness and was engaged in criminal conduct. (*See id.* at 48-53). In support of his argument, he identifies Voght's testimony on re-direct examination that he was assaulted while incarcerated, the prosecutor's question if the assault had occurred after discovery materials had been provided to the defense, and the overruling of counsel's immediate objection and later motion for extraordinary relief. (*See id.* at 47) (citing N.T. Trial, 12/03/19, at 49-50, 82).

The trial court explains that Voght testified for two days, November 21 and December 3. On November 21, he testified under direct examination. On December 3, after the Thanksgiving break, he was presented for cross-examination, first by Jordan's counsel. (*See* Trial Ct. Op., at 19); (citing N.T. Trial, 12/03/19, at 6-34). Defense counsel produced the letter Voght had written on behalf of co-conspirator Baker. Voght "admitted to defense counsel that he had signed [the] letter, for Andrew Baker, attempting to exonerate the defendant. This witness testified that the reason he had produced such a

_____

overriding or misapplication of the law, the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill will or partiality, as shown by the evidence of record." *Commonwealth v. Melvin*, 103 A.3d 1, 35 (Pa. Super. 2014) (citation omitted).

letter was because he was concerned about his safety while in jail." (***Id.***).  On redirect, in response to this issue raised on cross-examination, the prosecutor asked Voght if he continued to be concerned for his safety after he wrote the letter and why.  When Voght told the prosecutor he had been assaulted, the prosecutor asked if it was after discovery had been passed.  The court overruled Jordan's immediate objection.  (***See id.*** at 23-24) (record citation omitted).  We discern no abuse of discretion.

"Relevant evidence" is defined as evidence that "has any tendency to make a fact more or less probable than it would be without the evidence" as long as "the fact is a consequence in determining the action."  Pa.R.E. 401(a)-(b).  Relevant evidence is admissible and irrelevant evidence is inadmissible.  ***See*** Pa.R.E. 402.  Even relevant evidence may be excluded if its probative value is outweighed by prejudice.  ***See*** Pa.R.E. 403.

"The scope of redirect examination is largely within the discretion of the trial court."  ***Commonwealth v. Gonzalez***, 109 A.3d 711, 730 (Pa. Super. 2015) (citation omitted).  On cross-examination, if defense counsel "delves into what would be objectionable testimony on the part of the Commonwealth, the Commonwealth can probe further into the objectionable area."  ***Commonwealth v. McCloughan***, 421 A.2d 361, 363 (Pa. Super. 1980) (citation omitted).

In this case, as explained by the trial court, it was Jordan's counsel who introduced the letter on cross-examination and questioned him about whether

his statement therein that he was concerned for his safety was why he had not come forward with the contents of the letter sooner. (**See** N.T. Trial, 12/03/12, at 12). This opened the door to the Commonwealth's questions about whether he had continued safety concerns and why. Jordan cannot be heard to complain about their relevance now. **See McCloughan**, **supra** at 363; **see also Commonwealth v. Smith**, 17 A.3d 873, 915 (Pa. 2011), *cert. denied*, 567 U.S. 937 (2012) ("Because the evidence Appellant now claims was inadmissible was admissible because Appellant opened the door, and the trial court, within its discretion, permitted the prosecutor's cross-examination, there is no basis for assertion that the trial counsel was ineffective for failing to move to strike.").[19]

Moreover, even if the admission of the testimony was an abuse of discretion, Jordan has failed to establish prejudice. This was a two-week trial with over 20 witnesses. Voght and Baker's identification of Jordan as being one of the co-conspirators in the robbery and Baker's testimony that Jordan admitted to shooting the victim, was not impacted in any way by Voght's statement about the in-custody assault. Nor is there any evidence that the

_____

[19] Neither are we persuaded by Jordan's reliance on **Commonwealth v. King**, 689 A.2d 918 (Pa. Super. 1997), for the proposition that threats by third persons against witnesses may be relevant only if the defendant is linked in some way to the threat. (**See** Jordan's Brief, at 49-50). As we explained above, this information came in during re-direct after Jordan's counsel opened the door to the fact that Voght felt unsafe in prison. Whether it would have been permissible had the door not been opened is irrelevant.

jury made its decision based on an inference that Jordan was engaged in other criminal activity other than the crimes with which he was charged. (**See** Jordan's Brief, at 52-53). Accordingly, the trial court did not abuse its discretion in overruling his objection to the admission of Voght's testimony. **See Hernandez**, **supra** at 489.

**E.**

In his fourth issue, Jordan argues that the trial court abused its discretion in overruling his objection to alleged prosecutorial misconduct and denying his subsequent motion for extraordinary relief.[20] (**See** Jordan's Brief, at 53-61). Specifically, he maintains that the prosecutor displayed a photograph on a projection screen during her closing that the parties previously had "agreed was inadmissible and which contained highly prejudicial information not shown to the jury." (**Id.** at 54, Exhibit 1 (Instagram photograph). This photograph was hearsay that "contained highly prejudicial information not previously shown to the jury." (**Id.** at 54) (citing N.T. Trial, 12/12/19, at 107).

> The Pennsylvania Supreme Court has stated that "[t]he essence of a finding of prosecutorial misconduct is that the prosecutor, a person who holds a unique position of trust in our society, has

---

[20] "Our standard of review for a claim of prosecutorial misconduct is limited to whether the trial court abused its discretion. It is within the discretion of the trial court to determine whether a defendant has been prejudiced by misconduct or impropriety to the extent that a mistrial is warranted." **Commonwealth v. Melvin**, 103 A.3d 1, 26 (Pa. Super. 2014) (internal citations and quotation marks omitted).

abused that trust in order to prejudice and deliberately mislead [the factfinder]." ***Commonwealth v. Pierce***, [] 645 A.2d 189, 197 (Pa. 1994). Prosecutorial misconduct will justify a new trial where the unavoidable effect of the conduct or language was to prejudice the factfinder to the extent that the factfinder was rendered incapable of fairly weighing the evidence and entering an objective verdict. If the prosecutorial misconduct contributed to the verdict, it will be deemed prejudicial and a new trial will be required.

***Melvin***, ***supra*** at 26. "The touchstone is the fairness of the trial, not the culpability of the prosecutor." ***Id.*** (citations omitted).

Here, we first note that any alleged agreement between the parties about the Instagram photograph is not of record and, therefore, does not exist for our review.[21] ***See Commonwealth v. Rush***, 959 A.2d 945, 949 (Pa. Super. 2008), *appeal denied*, 972 A.2d 521 (Pa. 2009) ("[D]uring our review of a case, we rely only on facts and documents in the certified record. This Court does not rely on items *dehors* the record, such as assertions in an appellate brief or a trial court opinion.") (citations omitted).

The record reflects that there was no such agreement because the prosecutor's argument on Jordan's motion to extraordinary relief reveals that she disagreed with Jordan's position. (***See*** N.T. Sentencing, at 14-15). Further, our review of the record confirms that both Baker and Detective Lucke

---

[21] In fact, when she objected during the Commonwealth's closing, Jordan's counsel did not make any argument that there had been an agreement for the use of only a redacted photograph. (***See*** N.T. Trial, 12/12/19, at 112). This allegation was not raised until Jordan's sentencing, when counsel made the motion for extraordinary relief.

testified about the Instagram post containing the April 29, 2014 photograph that Jordan later complained had not been introduced at trial, and there is no indication that it had been redacted since they also talked about the usernames identified in the posted comments. (**See** N.T. Trial, 12/11/19, at 20-21, 42-44, 69-71, 102-04); (**see also** N.T. Trial, 12/04/19, at 104-05; N.T. Trial, 12/05/19, at 24).

Moreover, even if the prosecutor had used a photograph that was not redacted as it had been during trial, Jordan is unable to establish that it affected the verdict. The court gave the jury an instruction in which it advised that it was not bound by counsel's recollection of evidence during closing argument, and that it should consider only evidence that was introduced during trial that it found material. (**See** N.T. Trial, 12/12/19, at 152-54). The jury is presumed to have followed this instruction and Jordan has failed to establish that it did not do so. **See Commonwealth v. Travaglia**, 28 A.3d 868, 882 (Pa. 2011), *cert. denied*, 566 U.S. 940 (2012). Finally, this was a two-week trial with the testimony of over 20 witnesses, two of whom expressly identified Jordan as being involved in the robbery conspiracy and one who testified that Jordan admitted to being the shooter. Even assuming *arguendo* that there was an error on the part of the prosecutor, it would be harmless. **See Commonwealth v. Mitchell**, 839 A.2d 202, 214-15 (Pa. 1003). Jordan's claim of prosecutorial misconduct fails. **See Melvin**, **supra** at 26.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/29/2021